DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Maverick Constructors, LLC | ) | ASBCA No. 61989 |
| | ) | |
| Under Contract No. W912EP-13-C-0033 | ) | |

APPEARANCES FOR THE APPELLANT: James E. Krause, Esq.
  James E. Krause, P.A.
  Jacksonville, FL

Joseph W. Lawrence, II, Esq.
  Vezina, Lawrence & Piscitelli, P.A.
  Fort Lauderdale, FL

Devin Maxwell, Esq.
  Law Offices of Devin Maxwell
  Okeechobee, FL

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Kristin Bigham, Esq.
Sharon Shim, Esq.
Catherine Awasthi, Esq.
James M Zaleski, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Jacksonville

OPINION BY ADMINISTRATIVE JUDGE WILSON

This appeal arises from a construction project in Hendry County, Florida. Appellant, Maverick Constructors, Inc. (Maverick or appellant), challenges the contracting officer's denial of all nine of its certified claims. Within these claims, appellant argues that it is entitled to monetary compensation and time extensions for delays associated with certain issues that it allegedly encountered during construction, including a differing site condition, a constructive change, a design defect, and the government's alleged decision to delay the contract closing date.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The Board conducted six hearing dates between January and August 2022, at which Vice Chairman Shackleford presided[1].  For the reasons stated below, the Board denies the appeal in its entirety.

<u>FINDINGS OF FACT</u>

1.  On August 9, 2013, the United States Army Corps of Engineers (USACE or Corps) issued Solicitation No. W912EP-13-B-0006 for the construction of "water resource area levees, canals, pumping stations, control structures, siphon, access roadways, and associated appurtenant work" in connection with the Big Cypress Seminole Indian Reservation Western Water Conservation Restoration Project, Basin 2 and Siphon 2 ("the Project") in Hendry County, Florida (R4, tab 5 at 1044, 1289).

2.  The Project aimed to "rehydrate wetlands, improve water quality and water storage capacity on the Seminole Tribe's Big Cypress Basin Reservation, the Big Cypress National Preserve, and the Everglades Protection Area" (compl. ¶ 29).

3.  The Solicitation stated that the scope of work to be performed in Basin 2 would include:

> a.  Clearing and grubbing of right-of-ways for levee and canal construction.
> b.  Excavation of canals and placement of compacted embankment fill for levees, berms, and access roadways for Water Resource Areas 2E and 2W.
> c.  Excavation of new drainage canals and cleaning of existing drainage canals.
> d.  Installation of Siphon 2 including inlet and outlet control structures, 60" diameter piping, and excavation of spreader canals.
> e.  Construction of four pumping stations.
> f.  Installation of water control structures fabricated from corrugated aluminum culverts. Structures may include light duty sluice gates, concrete headwalls, and access catwalks.
> g.  Installation of 42" diameter piping for a level equalizing structure between Water Resource Areas 2E and 2W.

---

[1] Although Vice Chairman Shackleford was the presiding judge at the hearing, he retired prior to the issuance of this decision.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

  h.  Installation of new culverts and citrus grove bed
      drainage pipes along the alignments of new canals.
  i.  Installation of barbed wire fencing, cattle gates,
      guardrail, and fabricated security gates.
  j.  Construction of lime rock surfaced access roads where
      indicated for subsequent operation of the project.

(*id.* ¶ 32)

4.  Along with the Solicitation, the government provided potential bidders with information regarding a pre-bid site visit, a bid schedule, design drawings and specifications drafted by the government, engineering and soil studies, a pricing schedule and measurement of quantities, and soil investigation information (*id.* ¶¶ 32-33).  Contractors had no input in drafting any of the specifications and were not permitted to deviate from the solicitation's requirements (*see* R4, tab 5 at 1067) ("DESIGN AUTHENTICATION This project was designed by Burns & McDonnell Inc. for the Jacksonville District, U.S. Army Corps of Engineers").

5.  On September 27, 2013, the government awarded firm-fixed-price Contract No. W912EP-13-C-0033 (contract) to Maverick (R4, tab 5 at 1042-2019).  Mr. Carlos Rodriguez is the president of Maverick (tr. 1/33).

6.  Maverick hired Close Construction, LLC (Close) to serve as the project's first tier subcontractor.  Mr. Thomas Close is the president of Close (app. supp. R4, tab 192 at 12367-12416; tr. 1/40-41; 3/9).

7.  The subcontract between Maverick and Close allowed pass-through claims as needed (app. supp. R4, tab 192 at 12378, 12382).  Specifically, the subcontract stated that "[t]he Contractor agrees to permit the Subcontractor to prosecute and claim, in the name of the Contractor, for the use and benefit of the Subcontractor in the manner provided in the Contract Documents for similar claims by the Contractor upon the Agency" (*id.* at 12378).  In addition, the subcontract stated that the subcontractor shall have the full responsibility for the preparation and presentation of such pass-through claims (*id.* at 12382).

8.  Close hired Cliff's Trucking, Inc. (Cliff's) to serve as its subcontractor; Mr. Clifford Lakeman is Cliff's vice president (tr. 1/40-41, 61, 63-66; app. supp. R4, tab 344 at 21564).

9.  On December 6, 2013, Maverick received the Notice to Proceed establishing a project completion date of April 20, 2015 (R4, tab 6 at 2020-21; *see also* R4, tab 5

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

at 1129).

10. The contract incorporated the following Federal Acquisition Regulation (FAR) clauses by reference: FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); FAR 52.242-14, SUSPENSION OF WORK (APR 1984); FAR 52.236-16, QUANTITY SURVEYS (APR 1984), paragraph (b); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 5 at 1110; compl. ¶ 36).

11. The contract also incorporated FAR 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) (R4, tab 5 at 1220). Specifically, the contract stated that the contracting officer may designate a contracting officer's representative (COR) to perform "specific technical or administrative functions" and that the contractor shall not accept any instructions issued by any person other than the CO or the COR acting within the limits of the COR's authority (*id.* at 1220, 1246). In addition, the notice of contract award provided that only a warranted contracting officer, defined as either a Procuring Contracting Officer (PCO) or an Administrative Contracting Officer (ACO), "acting within their designated limits, has the authority to issue modifications or otherwise change the terms and conditions of this contract" (*id.* at 1042).

*Contract Provisions Regarding Excavation and Levee Construction*

12. The contract directed Maverick to excavate canals and place specified quantities of compacted embankment fill for levees (R4, tab 5 at 1289, 1948, 1956; tr. 2/89; *see also* gov't br. at 7).

13. Specifically, the contract required Maverick to use "satisfactory materials" in the completion of this task, including "imported fill . . . free from roots and other organic matter; contamination from hazardous, toxic or radiological substances; trash; and debris" (R4, tab 5 at 1628). The contract distinguished "satisfactory materials" from "unsatisfactory materials," the latter of which include "man-made fills; trash; refuse; and material classified as satisfactory which contains roots and other organic matter, and rocks greater than 3" in any dimension" (*id.*).

14. Levee embankments were to "consist of suitable fill excavated from the adjacent canals, spoil piles, West Feeder Canal Plugs, spreader canal, processed caprock or imported from designated borrow area" (*id.* at 1635).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

15. Paragraph 3.5.3 of Contract Specification 31 00 00 stated:

> The gradation and distribution of materials throughout the
> levees, including processed caprock materials, shall be
> such that the embankment will be free from lenses,
> pockets, streaks, and layers of stone material differing
> substantially in texture or gradation from surrounding
> material of the same class.

(*Id.* at 1636)

16. Paragraph 2.1 of Contract Specification 31 00 00 described the materials to be encountered during excavation. The paragraph stated:

> Materials to be excavated from canals and spoil piles
> generally include caprock, sandy soils, sand, and
> miscellaneous topsoil and organics. All materials
> encountered shall be unclassified. Caprock is expected to
> be encountered, is expected to vary from weathered to
> competent and hard. Rock shall be mechanically
> excavated. If not suitable for use as fill for levees, caprock
> shall be processed until the requirements for suitable fill
> are met. Excess caprock not required for levee
> construction shall be hauled to the indicated stockpile
> locations.

(*Id.* at 1631)

17. Although caprock is not explicitly defined in the contract documents, caprock refers to limestone found in Florida (tr. 4/33, 104).

18. The contract identified a borrow area from which Maverick was permitted to excavate materials for the embankment and levee construction, if needed (R4, tab 5 at 1052, 1632-34).

19. The contract also contained numerous contract line-item numbers (CLINs) on a bid schedule for discrete portions of work.

20. CLIN 14 is the line item for the excavation of the WRA2W canal, WRA2E canal, and Canal 1 (R4, tab 5 at 1046; *see also* tr. 1/66). Specifically, CLIN 14 states, in relevant part:

5

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> Payment will be made for all costs associated with or
> incidental to canal construction, including but not limited
> to excavation; processing material to remove roots,
> organics, and rocks greater than 3 inches in any dimension;
> transportation and disposal of unsuitable materials; and
> providing and maintaining access to the work site.

(R4, tab 5 at 1303; *see also id.* at 1046)

21. Cliff's price for canal excavation under CLIN 14 was $5.50 per cubic yard[2] (tr. 1/78). Within this price, Cliff's included costs for excavating the material from the proposed canals and casting it into areas within the levee embankment, hauling material into the levee embankment, and labor to extract roots and organics (tr. 2/10). It is undisputed that this price did not include the cost of transporting, screening, removing, or processing rocks (app. post-hearing reply at 8; gov't br. at 35; tr. 1/77-82, 114-15; 2/11-12, 14).

22. CLIN 15 is the line item for the construction of WRA 2E and 2W levee construction (R4, tab 5 at 1046; *see also* tr. 1/66; 2/13). Specifically, CLIN 15 states, in relevant part:

> Payment will be made for costs associated with or
> incidental to excavation, dewatering, borrow, processing to
> remove roots, organics, and rocks greater than 3 inches in
> any dimension, processing of oversized rocks into suitable
> material, transportation, and placement of suitable
> materials; providing and maintaining access to the work
> site.

(R4, tab 5 at 1303-04; *see also* tr. 1/66, 2/13)

23. Cliff's price for levee construction under CLIN 15 was $8.25 per cubic yard[3] (tr. 1/78). This price included scarifying existing ground, line and grade placement, the cost of a dozer to achieve line and grade, vibratory rollers for compaction, miscellaneous labor to handle organics or roots, and cost of transportation for suitable fill from the borrow area (tr. 1/80, 126-29; 2/10, 12-14). This price did not include the cost of transporting, screening, removing, or processing rocks (tr. 1/77-82, 114-15; 2/11-12, 14).

---

[2] In its bid, Maverick increased the price to $6.45 per cubic yard (R4, tab 5 at 1046).
[3] In its bid, Maverick increased the price to $9.65 per cubic yard (R4, tab 5 at 1046).

6

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

24.  The contract contained a geotechnical data report (GDR) which included data from geotechnical field investigations and subsurface soil information (R4, tab 5 at 1854-1946).

25.  The GDR included data regarding 20 core soil borings that were taken across the project site and that were representative of the subsurface conditions (R4, tab 5 at 1866-1921; tr. 4/99).

26.  The borings were taken using the split spoon method, which uses a two-inch diameter metal pipe to penetrate the soil (tr. 1/140-41; 2/35-37, 86-88, 174).

27.  The pertinent core borings (CB) revealed the following:

A.  CB-0050: "LIMESTONE, soft, moderately weathered, massive" was encountered at a depth of 1.5 ft. (R4, Tab 5 at 1868).
B.  CB-0051: "trace thin limestone lenses" were encountered at a depth of 0-1.5 ft. (R4, Tab 5 at 1872).
C.  CB-0053: "trace moderately weather limestone lenses" were encountered at a depth of 4.5 ft. (R4, Tab 5 at 1880).
D.  CB-0055: "highly fractured, moderately weathered limestone lenses" at a depth of 4.5 ft. (R4, Tab 5 at 1885).
E.  CB-0056: "LIMESTONE, sandy, hard, moderately weathered, highly fractured" at a depth of 4.5 ft. (R4, Tab 5 at 1886).
F.  CB-0040: "trace angular sand to gravel-sized limestone up to 3/4"" at a depth of 0.9 ft. (R4, Tab 5 at 1888) and "SAND, silty (RESIDUAL LIMESTONE)" at a depth of 3.7 ft.  (*Id.*)
G.  CB-0042: "SAND, silty (RESIDUAL LIMESTONE)" at a depth of 4.8 ft. (R4, Tab 5 at 1893).
H.  CB-0044: "SAND, silty (RESIDUAL LIMESTONE)" at a depth of 3.5 ft. (R4, Tab 5 at 1898).
I.  CB-0045: "SAND, silty (RESIDUAL LIMESTONE)" at a depth of 0.9 ft. (R4, Tab 5 at 1900).
J.  CB-046: "SAND, silty (RESIDUAL LIMESTONE)" at a depth of 3.0 ft. (R4, Tab 5 at 1903).
K.  CB-0047: "GRAVEL, silty, mostly limestone up to 1"" at a depth of 2.6 ft. (R4, Tab 5 at 1905).
L.  CB-0049: "SAND, clayey (RESIDUAL LIMESTONE)" at a depth of 3.6 ft. (R4, Tab 5 at 1911).

7

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

28.  Paragraph 1.1 of the GDR stated:

> Items discussed in the character of materials paragraph
> may not appear explicitly on the boring logs.  Based on
> historic knowledge of the project area, the character of
> materials paragraph includes items that supplement the
> data documented by the boring logs.  When reviewing the
> boring logs, use all of the data on the logs, including the
> materials description, legend, and blow counts.  When
> evaluating the subsurface conditions, use all of the data,
> including the character of materials paragraph and boring
> logs.

(R4, tab 5 at 1856)

29.  GDR Paragraph 1.2 is entitled "Character of Materials" (*id.* at 1856).
Paragraph 1.2.3 (Materials Encountered) stated, in relevant part:

> The subsurface materials are comprised of approximately 4
> feet of fine-to coarse-grained silty and clayey sand.  The
> sand is primarily quartz with little calcium carbonate or
> shell material.  Underlying the silty and clayey sand is 1.5
> to 15 feet thick limestone unit, which exists locally as
> intensely to moderately weathered and moderately hard to
> hard rock.  This rock undulates and can be exposed as
> outcrops periodically throughout Basin 2.

(*Id.* at 1857)

30.  Paragraph 1.2.3 of the GDR defined 'gravel' or 'gravel-sized limestone' in
borings to mean "rock lenses that were broken during sampling that represent hard
rock layers" (*id.* at 1857).

31.  The GDR also stated in paragraph 1.2.2 (Local Geology) that "[i]n some
places rock lenses of limestone or sandstone with thickness ranging from 1 foot to 1.5
feet occur at shallow depths (less than 8 feet).  Occasionally, rock outcrops occur as a
thin veneer" (*id.*).

32.  In addition, the GDR defined boulders as "particles greater than 12 inches
in diameter" and cobbles as "particles greater than 3 inches but less than 12 inches in
diameter" (R4, tab 5 at 1858; tr. 4/46).

8

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Differing Site Condition*

33.  Cliff's was responsible for excavating the canal and borrow area (app. br. at 8; tr. 1/69).

34.  Prior to Cliff's excavation, Close cleared and grubbed the canal and borrow area by removing and extracting roots and organics from the soil down to the top of the caprock, or to a depth of 20 inches below the original surface level of the ground (tr. 1/126; 2/15, 180-83; R4, tab 5 at 1641-42).

35.  When Cliff's began its excavation, it encountered what appeared to be unsatisfactory materials in the borrow area (tr. 1/118, 122; 2/21).  After digging several test pits to evaluate what materials may be found in the ground, Cliff's confirmed that unsatisfactory materials existed in the borrow area (tr. 2/21).

36.  On June 27, 2014, Maverick provided USACE with written notice[4] of an alleged differing site condition, stating:

> At 2 feet +/- below grade, we encountered hardpan[5]
> material which we could not penetrate.  As a result, our
> final determination was that anything below 2 feet +/- has
> been deemed unsuitable material which has caused a
> substantial shortage of suitable materials required to
> complete the project.

(R4, tab 14 at 2107-08)

37.  In addition, Maverick also informed the government that its proposal had not factored in costs for processing any excavated material to convert it to satisfactory material (*id.* at 2108).

38.  Thereafter, USACE conducted a field investigation by using the split spoon method to take additional core borings (tr. 1/153; 3/158; 4/76).  Based upon the

---

[4] Appellant mentions another letter regarding this issue in an unnamed attachment to its REA that simply states, "INSERT DOCUMENT #19- Maverick's notice of the Differing Site Condition and request for meeting dated 23 April 2014" (R4, tab 3 at 000156).

[5] Hardpan refers to a combination of materials including organics, rocks, and sand that makes percolation difficult (tr. 2/20-21).  The hardpan found in Florida is limestone (tr. 4/40).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

findings of the investigation, the government found no merit in Maverick's alleged differing site condition (app. supp. R4, tab 51 at 2270-71).

39.  On March 20, 2015, Maverick informed USACE that several more test pits were excavated in the borrow area on February 20, 2015, that showed that the area "would require processing and crushing rock material in order to meet the project specifications" (R4, tab 22 at 2190-91).  Based upon these findings, Maverick concluded that the excavation was "an entirely different operation than what was anticipated based on the information provided in the RFP" (*id.* at 2191).

40.  On March 28, 2015, Maverick submitted Serial Letter H-0019 that contained a Request for Equitable Adjustment (REA) for an alleged differing site condition at WRA2W between Stations 30-45 in the canal.  In the REA, Maverick contended that it had:

> encountered a hardpan material at 2 feet +/- below grade in (3) separate sections totaling approximately 400lf, which we are not able to penetrate with normal earthmoving equipment.  This condition will require us to bring in additional manpower and different equipment in order to break-th[r]ough the hardpan material . . .

(R4, tab 93)

41.  USACE then conducted a second site investigation, but it again found no merit in Maverick's differing site condition allegations (app. supp. R4, tab 55 at 2280).

42.  In an effort to convert the excavated material into satisfactory material, Cliff's initially used laborers to remove the unsatisfactory material by hand.  When this method proved ineffective, Maverick brought a screen[6] to the site to process the unsatisfactory material.  (Tr. 1/69-70; 3/132)

43.  Cliff's initially chose to use a three-inch screen to process the unsuitable material, and government inspectors noted that oblong rocks and skinny long twigs

---

[6] A screen is a machine that breaks down larger rocks with multiple fabricated screens. After unsuitable material is loaded into the machine, the top deck of the machine catches larger rocks in a screen of six- or eight-inch squares and then the remaining rocks fall down to subsequent layers of increasingly smaller screens.  (Tr. 1/124)

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

were coming through the screen that did not meet contract specifications for satisfactory materials (tr. 1/124; 3/149).

44. The government relayed these deficiencies to Cliff's, but never directed Maverick to screen the material. As a result, Cliff's decided to change the three-inch screen to a one-inch screen. After the material was processed through the screener, Cliff's used hand labor to remove any remaining unsatisfactory material. (Tr. 1/70, 125-27; 3/132)

*Request for Additional Borrow Area*

45. On June 27, 2014, Maverick informed USACE that it anticipated running out of suitable materials by July 3, 2014 (R4, tab 14 at 2108).

46. On February 6, 2015, Maverick submitted Requests for Information (RFI) 84 and 85 informing the government that it was "out of borrow fill material" and requesting another borrow area (R4, tabs 19 at 2164; 89 at 2527).

47. In response, the government informed Maverick that its methods for processing material created a "significant amount of waste" and that more material could be recovered from the already processed material (*id.*).

48. In addition, the government advised Maverick that "[a]n additional borrow site is not available for the Contractor at this time. Once the Contractor has explored all options for producing suitable fill, the Contractor shall notify the Contracting Officer at that time of any new quantity shortages." (*Id.*)

49. On March 24, 2015, Maverick advised USACE that it depleted all the remaining material in the borrow area (R4, tab 23).

50. On March 27, 2015, USACE informed Maverick that it had coordinated with the Seminole Tribe of Florida to obtain additional land for borrow adjacent to the existing borrow site (R4, tab 92 at 2532-33).

51. An additional borrow area was made available to Maverick on April 2, 2015 (R4, tab 94; app. supp. R4, tab 206).

11

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Levee Rework*

52. The government repeatedly found fault with Cliff's levee construction and recorded the issues in its daily construction quality assurance reports. Specifically, on July 18, 2014, USACE employee Mr. Ronald Wilson noted:

> After inspecting the subcontractor's work on the re-grading of the WRA2E Levee . . . I noticed that they had dumped and spread some unsuitable materials on the levee. I informed Mr. Carlos Rodriguez . . . and requested that he correct the problem. He acknowledged, agreed, and stopped the subcontractor's operations in that area.

(R4, tab 151 at 5263) (*see also id.* at 5264) ("[c]ontractor was using unsuitable material to construct the levee . . . . This material had rocks greater than 3 inches and roots and other organic matter").

53. Thereafter, on July 21, 2014, Mr. Wilson informed Mr. Harry MacDonald, appellant's quality control (QC) manager, and Mr. Frank Spirato, appellant's superintendent, that Cliff's had "dumped and spread some more unsuitable materials on the levee" (*id.* at 5267). Mr. MacDonald "agreed the material was in fact unsuitable for levee fill because it had vegetative debris and rocks over 3" mixed in with the fill material," and appellant stopped all levee work (*id.*).

54. On July 22, 2014, the Corps held an internal conference call during which it proposed to send appellant a non-compliance letter based on "concerns of work performance [and] quality of material being used as levee fill in some sections (*id.* at 5270).

55. On July 25, 2014, Mr. Wilson and Mr. MacDonald performed a joint inspection on the levee and found that Cliff's "still has unsuitable materials to remove in that area" (*id.* at 5275).

56. Thereafter, on July 28, 2014, USACE employe Mr. Gabriel Clavijo concluded that levee construction at the north side of the West feeder canal should be reworked because "large pieces of wood and rocks larger than 3" were found at the site and that this material was not in accordance with contract specifications (*id.* at 5279-80).

57. On August 19, 2014, USACE quality assurance representative Mr. Jeff Zimmerman observed rocks greater than 3" in the screened levee material and notified

12

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the QC Manager. Later that day, Mr. Zimmerman surveyed the site once more and found "over a dozen rocks" that needed to be removed (*id.* at 5319). Based upon this observation, Mr. Zimmerman concluded that "there was no quality control present at the time and work did not meet the specification" (*id.*).

58. Ultimately, on October 6, 2014, appellant notified the Corps that it would remove and replace the levee (*id.* at 5398).

59. On October 6, 2014, USACE quality assurance representative Mr. Howard Lyons informed appellant that the levee "could not be paid for due to lack of testing documentation and numerous deficiencies noted by other USACE staff" (*id.* at 5397).

60. In an email response to Mr. Lyons, Mr. Spirato acknowledged that the levee did not meet contract specifications and stated that Maverick would "remove the existing material, process and then replace with material that meets the contract documents" (*id.* at 5398).

61. On January 16, 2015, Cliff's was once again informed that rocks greater than 3″ were found in the levee and Cliff's superintendent stated that he would correct this immediately (*id.* at 5539).

62. Finally, on March 18, 2015, Maverick submitted a formal notice that it was ready for the Corps' final survey of the levee work (*id.* at 5652).

63. On February 12, 2016, the government informed Maverick that it had performed final surveys to verify fill placement and canal excavation (R4, tab 130). Specifically, USACE informed appellant that because the "surveys reflect areas of levee embankment and canal excavation construction that [do] not meet the tolerances required by the contract . . . the Government will not accept the levee embankment and canal excavation work performed on WRA2E and WRA2W" (*id.*). Given this, the government directed Maverick to correct the embankment and excavation construction to conform with the contract requirements (*id.*).

64. On April 11, 2016, the government notified Maverick that it was concerned that the levee work would not conform with the lines and grades required by the contract (R4, tab 133).

65. On May 16, 2016, the government informed Maverick that it had found that 65 "stations in which the levee embankment or canal's lines and finished grades appear to reflect construction not conforming to the tolerances required by contract specification section 31 00 00 paragraph 1.5" (R4, tab 134).

13

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

66. On November 25, 2016, the government informed Maverick that it performed surveys that revealed "roughly twenty (20) stations in which the levee embankment or canal's lines and finished grades appear to reflect construction not conforming to the tolerances required by contract specification 31 00 00, paragraph 1.5" (R4, tab 138 at 2678).

67. On February 21, 2016, the government informed Maverick:

> [I]t is apparent that Maverick constructed the levees on WRA2E from station 149+00 to 161+00 in accordance with RFI 0052. This change in section width shall be shown in both the Redline As-builts and Final As-builts. No remedial work is required at WRA2E survey stations 149+00 to 161+00.
>
> After further review of survey data, with consideration of Maverick's response in letter H- 0051, station 25+00 is within elevations, grades, and tolerances required by contract plans and specifications.
>
> All other survey stations referenced in Maverick's letter H-0051, WRA2E 30+00, 85+00, 110+00, 115+00, 116+00, 144+00 WRA2W 104+00, 111+00, will require correction since a shift in centerline, as allowed in Government letter C-0095, will not result in constructed levee within the tolerances required by the contract specifications.

(R4, tab 140).

68. By April 6, 2017, all outstanding deficiencies preventing substantial completion had been corrected (R4, tab 144 at 2703).

*Surveying*

69. Pursuant to the contract, Maverick was required to perform and submit quantity surveys for any periods which progress payments were required and to make computations based upon the survey results (R4, tab 5 at 1204-05).

70. The government was required under the contract to conduct original and final quantity surveys of the estimated units to compute "the quantities of work performed and the actual construction completed and in place" (*id.* at 1204).

14

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Tie Rod Anchor Connections at Pump Station 15*

71. The contract required the construction of Pump Stations 14 and 15 (R4, tab 5 at 1301).

72. Both pump stations had a concrete pile cap with sheet pile walls, and the walls were supported by tie rod anchors that extended landward from the pile cap to a deadman for lateral support (*id.* at 1990, 1993, 2001; tr. 3/11-19).

73. Contract drawing S201 provides:

> UPON DRIVING OF THE SHEET-PILES, AND PRIOR
> TO PLACEMENT AND COMPACTION OF BACKFILL
> MATERIAL, THE CONTRACTOR SHALL
> CONSTRUCT AND CONNECT THE SHEET-PILE
> WALL, CONCRETE DEADMEN [sic] AND ANCHOR
> RODS AS SHOWN ON THE DRAWINGS.

(R4, tab 5 at 1986).

74. Details A, B, and C on contract drawings S208 and S217 show the tie rod anchors and the sheet pile wall for the pump stations (*id.* at 1993, 2001).

75. Specifically, Details A, B, and C on contract drawing S208 shows the inside of the pile cap and the tie rods penetrating the sheet pile wall on the pan-in side with a hex nut and beveled structural washer on the end (*id.* at 1993; tr. 3/68-69).

76. During construction of Pump Station 15, Mr. Zimmerman noticed that the tie rods at the pump station ended in the middle of the pile cap unfastened to the sheet pile walls (tr. 3/136, 167-68). Mr. Zimmerman communicated his concerns regarding the tie-rod installation to Maverick's QC staff, including Maverick's alternate QC manager, Mr. Carlos Rodriguez[7] (R4, tab 151 at 5636 ("Carlos Rodriguez (Alt QC) working on site today); *see also* tr. 3/136-37, 168, 175).

---

[7] The name 'Carlos Rodriguez' is shared by two of Maverick's employees:  its president, Mr. Carlos Rodriguez, Sr. (Carlos Sr.), and his son, Mr. Carlos A. Rodriguez, Jr (Carlos Jr.).  The record is unclear as to which man served as the alternate QC manager that was in contact with Mr. Zimmerman in March 2015. *See* R4, tab 151 at 5200 ("alternate Quality Control Manager Carlos A. Rodriguez"); *id.* at 5263 ("Carlos Rodriguez (Alt. CQC)"); *id.* at 5416 ("Alternate Quality Control Manager Carlos A. Rodriguez"); *id.* at 5543

15

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

77.  Mr. Zimmerman's concerns were documented in Quality Assurance Report ("QAR") No. 474, dated March 25, 2015.  Specifically, QAR No. 474 stated that Pump Station 15's "Anchor Rods are not in contact with the Sheet Pile Wall and are floating in the middle of the sheet pile cap" (R4, tab 151 at 5669).

78.  Similar concerns were documented in QAR No. 476, dated March 27, 2015:

> QC called for a final follow-up inspection of the sheet pile cap at PS 15.  We discussed all of the observations made previously at PS 15.  I told the Alt QC Manager I was concerned that it would not be possible to perform all of the work neccessary [sic] to bring the sheet pile cap in to [sic] conformance with the Contract Documents.  He told me that he would do what ever [sic] it takes to make certain it happened.  He further stated that if "it isn't ready to pour on Monday then we won't pour."
>
> …
>
> Tie Back Anchor Rods are not all in contact with Sheet Pile Wall.  Alt QC Manager told me they would "extend the rods or cut holes or do whatever we have to do to make it work.  No Problem."  I was then told that "if it isn't ready Monday, I won't let the [sic] guys pour."

(R4, tab 151 at 5675) (*see also* app. reply br. at 35) (conceding that "the Corps did identify some type of concern on PS-15 on Friday, March 27, 2015")

79.  In QAR No. 479, dated March 30, 2015, Mr. Zimmerman wrote, "[o]n the way in to [sic] the office I called the Alternate QC Manager and discussed PS15 Sheet Pile Cap.  He told me 'the guys' were finishing the corrective actions and all would be ready before concrete arrived."  (R4, tab 151 at 5681)

---

(stating that Carlos Jr. submitted Carlos Sr. as an "Alternate QC Manager").  *See also* tr. 1/59 (Carlos Rodriguez Sr. testifying that his son "was filling in as a quality control. . . . there was a lot of animosity on this job which really caused a lot of problems for us with personnel.  So, every now and then, we would ask him to go down there and fill in or to augment.").

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

80.  On March 30, 2015, Maverick poured concrete on the pile cap at Pump Station 15 (app. supp. R4, tab 62).

81.  On April 23, 2015, USACE issued a deficiency for Pump Station 14 in QAR No. 503, noting:

> Details A, B, & C on Sheet S209 show Tie Back Anchor
> Rods installed through Sheet Piles and installed with a
> beveled washer.  KTR [Contractor] has over cut the Sheet
> Pile @ PS 14 for the pipe penetrations and as a result
> cannot align tie back anchors properly through the sheet
> piling.

(R4, tab 151 at 5745)

82.  On April 30, 2015, the government informed Maverick that the tie rod anchors had to be installed through the sheet pile wall at Pump Station 14 (R4, tab 25 at 2194-95).

83.  On May 1, 2015, Maverick responded by arguing that the specifications did not show the tie rod anchors penetrating the out-pan side of the sheet pile wall (app. supp. R4, tab 59 at 2350-51).

84.  On May 4, 2015, USACE issued Serial Letter C-0055, stating, in relevant part:

> Maverick notified the Government that they intend to
> proceed with a concrete placement of the pile cap
> tomorrow at 9:00 am without taking corrective measures to
> ensure that all tie back anchor rods are installed through
> the sheet pile wall.  If the Contractor proceeds without
> taking corrective action, the current installation could
> compromise the structural integrity of the sheet pile cap
> and develop into a potential safety issue.
>
> As mentioned in previous meetings and in serial letter
> C-0054, all of the anchor rods shall be installed through the
> sheet pile wall.  The Government notified your field staff
> of this deficiency on multiple occasions, including

17

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

notification through QCS with deficiency QA-00185
issued on April 23, 2015.

(R4, tab 26 at 2197)

85.  Maverick filed RFI 104 recommending the connection of the tie rods
at Pump Station 14 (app. supp. R4, tab 61 at 2356).

86.  USACE became concerned that the tie rods at Pump Station 15 had not
been connected to the sheet pile wall prior to the pouring of concrete.  Given this, the
government asked Maverick to confirm if the tie rods had been connected to the sheet
pile wall at Pump Station 15 (app. supp. R4, tab 62).

87.  Maverick confirmed that approximately half of the tie rods were not
connected and only went through the in-pan of the sheet pile wall (app. supp. R4,
tab 63 at 2360-61).

88.  On May 28, 2015, USACE responded to RFI 104 by rejecting Maverick's
proposed solution and stating that a specific course of action would be forthcoming
(app. supp. R4, tab 61 at 2356).

89.  On May 29, 2015, the government sent designer of record Burns &
McDonnell a letter conceding that it disseminated defective specifications and plans
for the construction of Pump Stations 14 and 15 (app. supp. R4, tab 300).

90.  On June 24, 2014, Modification P00006 was bilaterally executed to
implement the method of connecting the tie rod anchors to the sheet pile wall at Pump
Station 14 (app. supp. R4, tab 310 at 20587-89).

91.  On July 2, 2015, the government told Maverick to suspend all work
associated with the construction of Pump Station 15 in light of changes to the structure
proposed by the Engineer of Record to remediate the sheet pile anchoring system (R4,
tab 101).

92.  On August 27, 2015, Mr. Zimmerman wrote a memorandum for the
record detailing the tie rod anchor issue with Pump Station 15.  In the memorandum,
Mr. Zimmerman stated that he discussed the floating tie rod anchor issue with
Maverick QC personnel on March 25 and 27, 2015, prior to concrete placement.
(App. supp. R4, tab 319 at 20621-22)

18

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

93.  Negotiations between USACE and Maverick regarding a bilateral agreement concerning the tie rod anchor connections at Pump Station 15 were unsuccessful.  Thereafter, USACE issued unilateral Modification No. P00007 for Phase I of the Pump Station 15 tie rod anchor connections.  Modification No. P00007 increased the contract amount by $29,207.69 and extended the contract completion date by 21 calendar days from June 14, 2015, to July 5, 2015 (R4, tabs 31 at 2212-13; app. supp. R4, tab 74).

94.  On November 3, 2015, Maverick notified USACE that it considered Modification No. P00007 to proffer an insufficient amount to proceed (app. supp. R4, tab 75).

95.  Thereafter, the government responded by stating, in relevant part:

> The $29,207.69 included in Unilateral Modification No. P00007 (Change GN006) accounts for the labor, materials, and time related to connecting anchor rods to the sheet pile wall at Pump Station 15.  Rework related to all other anchor rod connections is considered non-compensable and is the responsibility of the contractor.  This direction to proceed with the described work was neither a not to exceed amount [n]or a partial amount of work to accomplish as noted in your Serial Letter H- 0039, but for you to pursue and complete all the work described on the drawings provided.

(R4, tab 115 at 2644)

96.  On January 29, 2016, the government issued unilateral Modification No. P00008 for Phase II of the Pump Station 15 tie rod anchor connections.  Modification No. P00008 increased the contract price by $15,316.35 and extended the contract completion date by five calendar days from July 5, 2015 to July 10, 2015.  (R4, tabs 32 at 2218; 129 at 2665-67)

97.  It is undisputed that Maverick ultimately completed the work outlined in Modifications Nos. P00007 and P00008 (compl. ¶ 157; answer ¶ 157).

19

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Constructive Change – Pond Risers*

98.  At the jobsite, each water resource area had an outfall structure in the form of a corrugated aluminum pipe (CAP) pond riser to permit water to flow into the West Feeder Canal (tr. 3/51-52).

99.  The legend on contract drawing G202 lists the different symbols for the culverts and outfall structures (R4, tab 5 at 1949).  Specifically, the drawing showed that the symbols for a "Culvert with Flashboard Riser" and "Outfall Structure" were the following:



(*Id.*)

100.  Contract drawing C203 shows the location of the two outfall structures with CAP pond risers and the seven CAP flashboard risers for the culverts (*id.* at 1061).

101.  Contract drawings C217 and C218 contain details regarding Outfall Structures 2A and 2B (*id.* at 1965-66).  The contract listed seven CAP flashboard risers in various locations:

    k.  Two culverts with CAP flashboard risers at WRA2W STA 0+00 to 60+00 as depicted in contract drawing C205 (*id.* at 1948, 1957).

    l.  Two culverts with CAP flashboard risers at WRA2E STA 60+00 to 120+00 as depicted in contract drawing C209 (*id.* at 1948, 1961).

    m.  Two culverts with CAP flashboard risers at Canal 1 STA 0+00 to 9+70.50 as depicted in contract drawing C211 (*id.* at 1948, 1963).

    n.  One culvert with a CAP flashboard riser at Pump Station 14 as depicted in contract drawing C229 (*id.* at 1948, 1973).

20

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

102.  Paragraph 1.2 of Contract Specification 33 44 00 required Maverick to provide the government with the "manufacturer's product data information for pipes and gaskets for joints" to be used for the culverts (*id.* at 1735).

103.  Close interpreted paragraph 1.2 as a direction to submit a shop drawing for product approval for the seven flashboard risers (tr. 3/52).  The submittal register required that the drawings for the culverts' flashboard risers all be included in a single submittal (*id.*).

104.  On April 14, 2014, Maverick submitted Transmittal No. 33 40 00-4, which included shop drawings showing pond risers (R4, tab 8 at 2024).

105.  Section II of Transmittal No. 33 40 00-4, titled "Approval Action," was signed by J. Mike Miller, ACO (*id.*; *see also* tab 3 at 285 (showing J. Mike Miller's signature and title)).

106.  USACE rejected Transmittal No. 33 40 00-4, stating "[r]isers are intended to be flash board riser[s] to allow for water control of adjacent irrigation ditches.  Risers shall be similar to what is being removed."  (R4, tab 8 at 2025)

107.  Thereafter, Maverick submitted Transmittal No. 33 40 00-4.3, which included shop drawings for all seven flashboard risers and seven shop drawings for pond risers (R4, tab 15 at 2113-23).  Notably, nothing in this transmittal indicated that it pertained to Outfall Structures 2A and 2B (*see generally* R4, tab 15).

108.  USACE approved Transmittal No. 33 40 00-4.3, commenting "CMP Pond riser w/outlet [sic] sheets should be removed from submittal as they are not applicable to this project" (*id.* at 2110).

109.  Once the transmittal was approved, Close ordered seven flashboard risers for the culverts as well as flashboard risers for the two outfall structures (R4, tabs 3 at 633; 109 at 2616).

110.  After the flashboard risers for the outfall structures were delivered, Maverick submitted RFI 61 inquiring how the concrete slabs should be poured for the flashboard risers at the outfall structures (R4, tabs 3 at 633; 16 at 2150).

111.  The government responded to RFI 61 by stating that it reviewed Transmittal No. 33 40 00-4.3 with regard to culverts and flashboard risers only.  USACE also explained "Outfall Structure 2A & 2B shall be built per plan as shown on sheets C217 and C218."  (R4, tab 16 at 2150)

21

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

112.  On October 10, 2014, Maverick submitted Transmittal No. 33 40 00-4.4, which contained pond riser drawings related only to Outfall Structures 2A and 2B (R4, tab 18 at 2156, 2159-63).

113.  The government approved Transmittal No. 33 40 00-4.4 and Maverick ordered the proper pond risers for the two outfall structures (R4, tabs 3 at 105, 633, 635; 18 at 2156; 109 at 2617).

*Check Valve System*

114.  Contract drawing S210 showed a concrete slab located 6″ above finished grade of the platform for the installation of an above-ground fuel storage tank:



(R4, tab 5 at 1995)

115.  Contract drawing C225 Section B indicated a platform elevation of 22.35′. Section B also showed that the fuel tank pad is adjacent to the pump house above that elevation:





(*Id.* at 1969)

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

116. Section A of contract drawing C225 also indicated that the elevation of the diesel pump engine is at the 22.35′ platform:



(*Id.*)

117. Contract drawing M209, and a note under the drawing, required that the pump station engine be mounted at an elevation that would put the fuel injectors higher in elevation than the 90% full level of the fuel storage tank:



(*Id.* at 2010)

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

118.  On May 5, 2015, the government issued Maverick a quality assurance deficiency in QAR No. 515 indicating that the engine mount height requirements outlined in contract drawing M209 had not been met (R4, tab 28 at 2202-03).

119.  On June 6, 2015, Maverick submitted RFI 110 regarding the pump station engine design.  In RFI 110, appellant stated that it "inadvertently missed the note on M-209 that states the engine mounting level must take into consideration the fuel injector height in relation to the fuel level in the tank @ 90% capacity to avoid a positive head on the injectors" (R4, tab 100 at 2580).

120.  On June 22, 2015, the contracting officer responded to RFI 110 regarding the pump station engine design and stated:

> The final installation must meet the requirements of the engine manufacturer and not void any warranty.  If the engine height cannot be adjusted to meet the requirements[,] then provide other means necessary.  Submit a plan and all required additional items to complete, along with any additional electrical loads due to controls, solenoids, etc.

(R4, tab 100 at 2580)

121.  The engine manufacturer recommended that Maverick install a check valve on the fuel oil supply line to protect the engine from head pressure while the engine is off (R4, tab 111 at 2633).

122.  The check valve system solution was approved and installed (compl. ¶ 137; answer ¶ 137; R4, tabs 111 at 2632; app. supp. R4, tab 281 at 20455-56).

*Seeding and Vegetative-Free Zone*

123.  In accordance with the contract, Maverick was required to seed all levee slopes and disturbed areas adjacent to the West Feeder Canal, including canal side slopes above 16.0′ elevation (R4, tab 5 at 1965, n.4).

124.  The contract stated that seeding operations should not commence until the grading and compaction requirements of the levees have been completed (*id.* at 1714).

125.  Specifically, the contract specified that the seed establishment period shall end 3 months after the last day of the seeding operation (*id.* at 1716).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

126.  In addition, the contract completion date did not include grass establishment (*id.* at 1293).  However, the contract required appellant to repair or reinstall grass that did not satisfy the government's requirements (*id.* at 1717; *see also* app. supp. R4, tab 335 at 20936-37 (showing that appellant had trouble growing grass)).

127.  Maverick was also required to establish a 5-foot vegetation free zone measured from the location where the levee toe ties into natural grade (R4, tab 5 at 1964).  Paragraph 3.1.1 of Contract Specification 31 11 00 provided:

> All areas within the clearing limits and as required for temporary access roads shall be cleared of surface vegetation, including ground litter, trees, shrubs, stumps, exposed roots, remnant agricultural crops and trees, and other woody-stalked vegetation.  Clearing limits are as indicated on the plans.  Surface objects and all vegetation shall be removed in advance of earthwork operations.

(*Id.* at 1641)

128.  The seeding and establishment of the five-foot vegetative free zone were payable as separate CLINs (*id.* at 1046-47).

129.  For CLIN 0016, titled "Seeding and Mulching," Maverick bid the unit price of $2,100 per acre for an estimated quantity of 51 acres for seeding and mulching (*id.* at 1047).

130.  For CLIN 0012, titled "Clearing and Grubbing," Maverick bid the unit price of $2,574 an acre for an estimated quantity of 81 acres (*id.* at 1046).  The estimated quantity was increased on September 12, 2016, to an estimated 122.44 acres (R4, tab 34 at 2225-27).

131.  On May 26, 2016, Maverick submitted RFI 2G requesting clarification on the scope of the five-foot vegetative free zone (R4, tab 135).

132.  On May 31, 2016, the government responded to RFI 2G.  Specifically, USACE referred Maverick to contract drawing C216 and explained that:

> The 5 foot vegetation free zone is to be measured from the location where the levee toe ties into natural grade.  Should the levee slopes be greater than that required by contract

25

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> sheet C216, a 5-foot vegetation zone is still required from
> the toe of the constructed levee slope.

(*Id.*)

*Liquidated Damages*

133.  The contract stated that the contractor shall be responsible for all "work performed until completion and acceptance of the entire work, except for any completed unit of work which may have [already] been accepted under the contract" (R4, tab 5 at 1201).

134.  The contract included a liquidated damages clause that specified "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of [$]1,718.00 for each calendar day of delay until the work is completed or accepted" (R4, tab 5 at 1129-30, 1293).

135.  USACE began withholding payment for the potential assessment of liquidated damages in pay estimate number 18, which covered the period from August 1, 2015, through September 30, 2015 (R4, tab 153 at 8397-98).

136.  Specifically, the government specified in pay estimate number 18 that it was "withholding a total amount of retainage of $185,544.00 in order to account for liquidated damages incurred to date in the amount of $1,718 per day for 108 days (14 Jun 15 to 30 Sep 15) in accordance with FAR 52.211-12" (*id.* at 8398).

137.  The government continued to withhold liquidated damages in subsequent pay estimate numbers 19 and 20 (*id.* at 8411-12, 8425-26).

138.  On January 11, 2016, Maverick submitted to the government Serial Letter H-0043 requesting that USACE suspend further withholding of liquidated damages because the project was substantially complete (R4, tab 125).

139.  In response, the government explained that all construction activities on the project site were not substantially complete because the levees failed to meet finish grade requirements in several locations and the work required by Modification No. P00008 still needed to be completed (R4, tab 131).

140.  On March 9, 2016, USACE limited the amount of liquidated damages that would be withheld in pay estimate number 21.  Specifically, the government found

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that Maverick was "behind schedule since the contract required completed date was July 10, 2015. The liquidated damage (LD's) rate is $1,718/per day. As of 3/7/16, the Government has withheld a total of $242,507.52. No retainage will be withheld on pay request number 21 per the guidance of the Contracting Officer." (R4, tab 153 at 8440-41)

141. Substantial completion of work occurred on March 14, 2017 (R4, tab 144 at 2703).

*Request for Equitable Adjustment*

142. On July 21, 2017, Maverick submitted to USACE an REA for seven counts of damages, including damages incurred by Close and Cliff's (compl. ¶ 1). Most of these counts were denied between January 18, 2018, and June 7, 2018 (*id.* at ¶ 3).

143. On August 2, 2018, Maverick submitted nine certified claims to USACE and requested a contracting officer's final decision via Serial Letters H-0057, H-0058, H-0059, H-0060, H-0061, H-0062, H-0063, H-0064, and H-0065 (R4, tab 3 at 21-29).

144. On December 19, 2018, the contracting officer issued a final decision denying the claims in their entirety (R4, tab 2 at 12-20).

145. Maverick filed an appeal with the Board on March 6, 2019,which was docketed as ASBCA No. 61989 (app. supp. R4, tab 211 at 13039).

146. The Board conducted a six-day hearing between January and August 2022. At the hearing, the parties presented a total of eleven fact witnesses as well as oral testimony from each party's scheduling expert. Both scheduling experts prepared a delay analysis which contained the expert's opinions regarding the causes of delay on the project, and to a certain extent - responsibility for each delay, and the impact of each delay (app. ex. A; R4, tab 380).

147. Maverick's scheduling expert, Mr. Patrick Brannon, presented extensive testimony at the hearing about his detailed schedule analysis of the project. In 1981, Mr. Brannon received a Bachelor of Science degree in engineering from the University of Florida (app. ex. A at 14). He subsequently worked as a project engineer, vice-president, and president for multiple companies in Jacksonville, Florida (*id.*). He holds two professional certificates and is a member of the Florida Department of Transportation disputes review board (*id.*). In his current role as the president of Oxley & Brannon Construction Consultants, Inc., he provides scheduling services on construction projects, including critical path method scheduling and schedule analysis

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

(tr. 6/9). In addition, he also analyzes design and construction defects from an engineering and architectural standpoint (tr. 6/10). In January 2022, Mr. Brannon was retained for this appeal by Maverick's subcontractor, Close, to evaluate the amount of delay that occurred on the project (tr. 6/11-12). The Board accepted Mr. Brannon as an expert in scheduling, delay and impact analysis, and damages (tr. 6/22). His analysis was offered to quantify the number of delay days attributable to the three primary causes of the delays: (1) differing site conditions (264 days of delay; of that, 219 were critical, and 45 days were near critical, or concurrent with the second primary cause of delay); (2) deficient design condition at Pump Station 15 (192 days of delay; 45 days was concurrent with the differing site conditions issue); and (3) Government delay in acceptance of the work after the earthworks and pump stations were operational and placed in service (284 days) (app. ex. A at 2, tr. 12-13). His analysis only quantified the delays; however, he did not attribute responsibility for the cause of the delays, which totaled 695 days (tr. 6/30, 111).

148. The government presented its own scheduling expert, Ms. Emma Chen. Ms. Chen received a Bachelor of Arts degree in architecture from Washington University in St. Louis, Missouri, and a Bachelor of Architecture degree from Florida Atlantic University (tr. 6/143-44). She has over twenty years of experience in public and private sector building design and construction, and she has worked for the Corps for the past seventeen years (R4, tab 380 at 1; tr. 6/143-44) Ms. Chen began her career at the Corps as a design architect in the Engineering Division. Around 2011, she became a technical expert in construction schedule management and, thereafter, assumed her current role as chief of the scheduling branch and instructor of construction schedule performance management. (Tr. 6/143-45) She holds several professional memberships and has a project management professional certification issued through the Project Management Institute (R4, tab 380 at 1; tr. 6/144). The Board accepted Ms. Chen as an expert in scheduling (tr. 6/146). She performed a critical path analysis of the project using a retrospective Forensic Schedule Analysis and opined that the majority of the delays were attributable to the contractor and that the contractor should be "awarded 32 days, excusable but not compensable" (R4, tab 380 at 25090). Ms. Chen concluded that Maverick and its subcontractors were fairly compensated for its delays through contract modifications and that 15 more days of excusable but non-compensable weather delays occurred due to flooding in multiple neighboring canals (*id*. at 25112-13). Additionally, Ms. Chen submitted a rebuttal to Mr. Brannon's report, challenging his approach to determining the cause and extent of the delays while maintaining her original conclusions (gov't ex. A).

149. Following the hearing of this appeal, the parties engaged in extensive briefing. The appeal is now before the Board for decision.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

DECISION

Appellant submitted 10 claims[8], some of which are interrelated (compl. ¶¶ 29-41, app. br. at 61-68). Specifically, appellant alleges that: (1) it encountered unsuitable material on the project which represented a differing site condition; (2) it and its subcontractors incurred additional costs during the time period where there was a delay in the Corps providing an additional Borrow area; (3) Cliff's incurred costs due to the removal and replacement of the levee along Cowbone Road; (4) the government failed to comply with its requirement to survey project material prior to and through construction; (5) it suffered general delays as a result of the Corps' failure to timely and properly act in response to the levee work issues; (6) a constructive change occurred when the Corps provided conflicting responses to requests for additional information regarding the corrugated aluminum outfall risers; (7) Maverick incurred costs and suffered delays when it was required to install an engine check valve system; (8) the government acknowledged a design defect in its specifications concerning the sheet pile wall anchoring system at Pump System 15, but only partially compensated (via unilateral Modification Nos. P00007 and P00008) Maverick for the costs and delays it experienced; (9) Maverick experienced an unreasonable delay as it awaited the government's acceptance of its work on seed establishment and the 5-foot vegetative free zone; and (10) Maverick is entitled to a cumulative 695-day delay through March 15, 2017, and the release of liquidated damages (*see generally* compl.; app. pre-hearing br.; app. br.; app. reply br.). Since filing its claim, appellant has withdrawn issue 4 regarding additional unforeseen surveying costs and issue 7 on the engine check valve system (app. br. at 37, 45). Given this, there are still 8 active claims that we will address within this decision.

1. *Differing Site Condition Claim*

Appellant alleges that both of its subcontractors, Close and Cliff's, encountered a differing site condition while excavating material to construct 33,765 lineal feet of new levees (app. br. at 8-34). Specifically, appellant alleges that all levee material was required to be less than three inches in size and dimension, in accordance with the contract (*id.* at 8). According to appellant, the contract specified that sand was a suitable material to be used to construct the new levee and that the first four feet of material encountered at the jobsite would be suitable material (*id.* at 12) (citing R4, tab 5 at 1857, 1868-1921). However, when appellant's subcontractors arrived at the jobsite and found the area designated by the Corps for excavation, they allegedly encountered unsuitable cobble and boulder-sized rocks (*id.* at 12-21, 25-32).

---

[8] There are nine substantive claims and one delay claim (compl. ¶¶ 29-41, app. br. at 61-68).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Appellant contends that its subcontractors expended a significant amount of additional money and time to separate the cobble and boulder-sized rock from the sand (*id.* at 32-34). Given this, appellant argues that the record evidence provides ample support for a Type I differing site condition (*id.* at 11). Accordingly, appellant argues that the Board should grant its differing site condition claim (*id.* at 8-34).

Conversely, the government counters that the contract and certain boring logs explicitly represented that limestone, rock lenses, and hard rock layers were located within the first four-and-a-half feet of the jobsite that could require processing (gov't reply br. at 4-14). Specifically, the government notes that the GDR provided that hard rock layers and lenses existed wherever the boring logs indicated gravel, and that the borings primarily relied upon by appellant were taken using the split spoon method, which cannot reveal the actual size of rock (*id.* at 6-7). In addition, the government cites multiple sections of specification 31 00 00, which explicitly discuss caprock (*id.* at 7-8) (citing R4, tab 5 at 1631, 1635). The government notes that appellant offers no explanation as to why it ignored representations in the contract regarding rocks and processing (gov't reply br. at 10-11). In addition, the government asserts that Close's differing site condition claim is completely unsubstantiated because there is no evidence in the record pertaining to this claim and Close cannot "latch onto Cliff's differing site condition claim without . . . independently [proving] each element of a differing site condition" (*id.* at 14; *see also id.* at 11-13). Accordingly, the government argues that the Board should deny appellant's differing site condition claim (*id.* at 14).

It is well-established that a Type I differing site condition arises when "the conditions encountered differ from what was indicated in the contract documents." *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1376 (Fed. Cir. 2007). In this regard, FAR 52.236.2, titled "Differing Site Conditions," provides:

> The Contractor shall promptly . . . give a written notice to the [CO] of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract. . . . If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause . . .

FAR 52.236-2(a)-(b).

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

To prevail on a Type I differing site condition claim, a contractor must prove that: (1) "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions"; (2) "the actual site conditions were not reasonably foreseeable to the contractor with the information available to the particular contractor outside the contract documents" (i.e., reasonable foreseeability); (3) "the particular contractor in fact relied on the contract representation"; and (4) "the conditions differed materially from those represented and . . . the contractor suffered damages as a result." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348-49 (Fed. Cir. 2008). "Determining whether a contract contained indications of a particular site condition is a matter of contract interpretation." *Id.* at 1350 (internal citation omitted).

Maverick has not proven the required elements of a Type I differing site condition by a preponderance of the evidence. The government correctly notes that the contract and certain boring logs explicitly state that limestone, rock lenses, and hard rock lenses were located within the first four-and-a-half feet of the jobsite. Specifically, Specification § 31 00 00, titled "EARTHWORK," provides some of the best evidence for both parties (R4, tab 5 at 1625). Appellant correctly notes that the contract clearly states that "rocks greater than 3″ in any dimension" are considered "unsatisfactory materials" that shall not be used in construction (finding 13). However, paragraph 2.1 of the specification stipulates that the materials to be excavated "generally include caprock, sandy soils, sand, and miscellaneous topsoil and organics" (finding 16; *see also* finding 17 (specifying that in Florida, caprock refers to limestone rock)). The paragraph continues:

> Caprock is expected to be encountered, is expected to vary from weathered to competent and hard. Rock shall be mechanically excavated. If not suitable for use as fill for levees, caprock shall be processed until the requirements for suitable fill are met. Excess caprock not required for levee construction shall be hauled to the indicated stockpile locations.

(Finding ¶ 16) Similarly, paragraph 3.5.1 specifies that the levee embankment was to consist of various materials, including "processed caprock" (finding 14).

The GDR also explicitly informs contractors that limestone rock existed throughout the jobsite. Specifically, paragraph 1.2.2, titled, "Local Geology," provides that "[i]n some places rock lenses of limestone or sandstone with thickness ranging from 1 foot to 1.5 feet occur at shallow depths (less than 8 feet). Occasionally, rock outcrops occur as a thin veneer." (Finding ¶ 31) In addition,

31

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

paragraph 1.2.3, titled "Materials Encountered," stated that limestone rock existed under the first four feet of subsurface silty and clayey sand "as intensely to moderately weathered and moderately hard to hard rock. This rock undulates and can be exposed as outcrops periodically throughout Basin 2." (Finding 29) Appellant was similarly directed to expect hard rock layers and lenses in any area in which the borings indicated that gravel was present (finding 30) (borings indicating 'gravel' or 'gravel-sized limestone,' shall be interpreted as "rock lenses that were broken during sampling and represent hard rock layers."). The record evidence reveals that 12 boring samples indicated the presence of either limestone or gravel at a depth of 4.5 feet or shallower: CB-0050, CB-0051, CB-0053, CB-0055, CB-0056, CB-0040, CB-0042, CB-0044, CB-0045, CB-0046, CB-0047, CB-0049 (finding 27).[9]

The contract's payment sections also anticipated the removal of rock greater than three inches during material processing at the jobsite. CLIN 14, the line item for the excavation of the canals, stated "payment will be made for all costs associated with or incidental to canal construction, including but not limited to excavation; processing material to remove roots, organics, and rocks greater than 3 inches in any dimension . . . ." (finding 20). Similarly, CLIN 15, the line item for levee construction, provided "[p]ayment will be made for costs associated with or incidental to excavation, dewatering, borrow, processing to remove roots, organics, and rocks greater than 3 inches in any dimension, processing of oversized rocks into suitable material . . . ." (finding 22).

In summary, the record evidence reveals that the contract, the GDR, and the boring logs all revealed that large rocks likely existed at the jobsite that needed to be processed to become suitable material. Given this, we conclude that the conditions that Maverick and its subcontractors encountered were not different than the conditions set forth in the contract. As such, appellant has not satisfied the first element of a Type I differing site condition.

---

[9] In its post-hearing brief, appellant argues that the boring logs did not inform contractors of the possibility of encountering cobble and boulder sized rocks (app. br. at 9). The government addresses this argument by asserting that the borings in the GDR were taken using the split spoon method (gov't reply br. at 7). According to the government, the split spoon method, which involves driving a two-inch diameter metal pipe into the ground to penetrate the soil, cannot reveal the actual size of rock (*id.*) (citing tr. 1/140-41; 2/35-37, 86-87, 174). Given the plethora of record evidence forewarning appellant of the possibility of some kind of rock within the first four feet of the jobsite, we do not need to address the merits of the split spoon method argument within this decision.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Appellant has similarly failed to satisfy the second factor of a differing site condition claim, namely whether Maverick and its subcontractors reasonably interpreted and relied upon the indicated site conditions. As discussed previously, Maverick did not reasonably interpret nor rely upon the contract's explicit provisions regarding the existence of rock at the jobsite. Rather, the record evidence reveals that Maverick, Close and Cliff's did not price into their original bid the cost of transporting, screening, removing, or processing rocks (findings 21, 23). It is well-established that under a fixed-priced contract, a contractor is responsible for its costs if it miscalculates its estimate or fails to take into consideration existing conditions that were identified in the bid documents. *See M.A. Mortenson Co.*, ASBCA No. 31903, 90-1 B.C.A. ¶ 22,313 at 112,058 ("Because the character of the rock was more troublesome than anticipated does not excuse the contractor from performance or entitle it to an equitable adjustment"); *Atlantic Dry Dock Corp.*, ASBCA No. 54936, 13 B.C.A. ¶ 35,344 at 173,472 ("It is the nature of a fixed-price contract to place the risk on a bidder that exercises its business judgment to establish its price and during performance finds its price to be low"). Appellant did not reasonably interpret or rely upon the contractual documents indicating that rock likely existed at the jobsite and needed to be processed. Accordingly, appellant has failed to meet the second element of a Type I differing site condition claim.

Similarly, appellant has not proven the third or fourth factors of a differing site condition claim, namely, whether the conditions encountered were materially different from those indicated or reasonably unforeseeable based upon all the information available at the time of bidding. As previously discussed, the contract, the GDR, and the boring logs all notified appellant and its subcontractors of the possible existence of rock within the first four feet of the excavation site that needed to be processed. Given this, the conditions that Cliff's and Close[10] encountered were not materially different than those indicated in the contract and the fact that rock was encountered at the jobsite was reasonably foreseeable.

Finally, we cannot conclude that the additional time and money Maverick expended to process rock at the jobsite was incurred because of the alleged differing site condition. As previously discussed, Maverick's original bid did not contain estimated costs for transporting, screen, removing, or processing rocks, even though

---

[10] In its post-hearing brief, appellant constructs a separate argument that Close was also affected by a differing site condition because it allegedly had to set up a screening operation to process backfilling dirt around the Siphon 2 pipe and it had to screen cobble-sized and boulder-sized rock (app. br. at 32-34). Appellant failed to cite any record evidence to support these arguments. Given this, we must deny appellant's alleged differing site condition claim for Close.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the contract documents indicated rock processing was likely (findings 21, 23). As such, Maverick's injury was not caused solely by the alleged differing site condition. Given this, appellant has failed to satisfy the fifth and final element of a Type I differing site condition claim. Because appellant has not satisfied any of the elements of the existence of a Type I differing site condition, its contentions must fail.[11]

## 2. *Additional Borrow Area Claim*

Appellant argues that all contractors working on the project incurred unexpected material screening costs because the government delayed the provision of an additional borrow area. According to appellant, the contract stated that the government would provide a borrow area containing sufficient fill material to complete the levee construction work (app. br. at 35). Appellant alleges that by June 2014, both parties were aware that the originally provided borrow area could not produce enough suitable material to complete construction and that by March 24, 2015, all suitable material was exhausted (*id.*). Appellant argues that the critical path was delayed nine calendar days because the government did not provide an additional borrow area until April 2, 2015 (*id.*) According to appellant, the government breached its duty of good faith and fair dealing by failing to properly and timely address this alleged differing site condition (app. reply br. at 28). Appellant argues that they are entitled to the additional costs incurred because of this delay (*id.*).

The government argues that there was always sufficient material in the excavations areas and the borrow area for levee construction, but that the material in those places needed to be processed (gov't br. at 41). According to the government, Maverick is responsible for the outcome of its chosen processing means and methods which resulted in overprocessing and a depletion of potentially suitable material (*id.*). In addition, the government argues that Maverick waited to alert the Corps of the shortage until the material in the original borrow area was completely depleted and that the government acted immediately after receiving Maverick's request (*id.* at 42). According to the government, Maverick "has not articulated nor presented any evidence of what its expectations were as to a reasonable time for USACE to provide additional borrow area after it was requested" (gov't reply br. at 16). Given this, the government alleges that its response time of nine days[12] to secure an additional borrow area was reasonable and that there could have been minimal time impacts if Maverick had provided notice of the shortage sooner (*id.*; *see also* gov't br. at 42). Accordingly,

---

[11] In its post-hearing brief, appellant also advances a connected delay claim regarding impacts to the levee work (app. br. at 38). This denial includes the delay portion of the claim advanced.

[12] Seven of the nine days were business days.

34

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the government argues that the Board should deny Maverick's breach of the duty of good faith and fair dealing claim.

"Every contract imposes upon each party a covenant of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). This covenant creates mandatory duties for each party to fulfill during contract performance, including the duty to refrain from interfering with another party's performance as well as the duty to reinforce the reasonable expectations of the other party. *Id.* at 991 (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). However, the covenant of good faith and fair dealing cannot expand contractual duties beyond those expressly laid out in the contract nor create new duties that are inconsistent with the contract's provisions. *Id.* (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010)). Breach of such a covenant can be proven in a myriad of ways, including a "lack of diligence and [willful or negligent] interference with or [a] failure to cooperate." *Id.* (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)). Appellant, as the proponent of this claim, bears the burden of proof. "[T]he proper inquiry regarding [this] duty often boils down to questions of 'reasonableness' of the government's actions." *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539.

Appellant has not proffered sufficient evidence to show that the government breached its duty of good faith and fair dealing. Appellant alleges that it submitted numerous written notices to the government regarding the existence of unsuitable material in the borrow area well before all fill material was depleted in March 2015 (app. br. at 35; app. reply br. at 28; *see* compl. ¶ 9 ("On 17 February 2015, [appellant] wrote to the Government about the fill shortage issue . . . [after submitting] a previous written request to USACE on April 23, 2014 to review . . . the unforeseen conditions encountered in the borrow area"); tr. 1/167:1-16 ("I know prior to [March 24, 2015] we had continued to express to [the government] that there would be a shortfall of material . . . . It was [a] continuous conversation through that whole year.")). However, a careful review of the record evidence reveals only one letter dated June 27, 2014, on this issue (finding 36). In fact, the only mention of another letter regarding this issue within the record appears within an unnamed attachment to appellant's REA that simply states, "INSERT DOCUMENT #19- Maverick's notice of the Differing Site Condition and request for meeting dated 23 April 2014" (*id.* at n.4).

The record evidence does show, however, that the government provided appellant with a second borrow area within seven business days of receiving notice that it had depleted all of the remaining material in the previous borrow area, which is

35

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

neither unreasonable nor grievous enough to be considered a breach of its duty of good faith and fair dealing (findings 49-51). While appellant may have submitted several written notices to the government regarding this issue, appellant has not met its burden of proof by providing said notices within the record currently before the Board. As such, the Board cannot conclude that the government acted unreasonably or breached its duty of good faith and fair dealing based upon the record before it. Accordingly, appellant's arguments must fail.

### 3. *Levee Administration Claim*

Appellant alleges that Cliff's experienced time impacts and incurred additional costs because the Corps required Cliff's to remove and replace a levee that Cliff's constructed along Cowbone Road in accordance with the terms of the contract (app. br. at 36-37). Specifically, appellant argues that the Corps ensured that Cliff's initial construction of the levee was in strict compliance with the contract by carefully monitoring Cliff's daily progress and reviewing every lift to confirm that its work passed inspections (*id.* at 36). Unfortunately, months later, and well after the point at which Cliff's realized that it was encountering difficulties at the construction site, Cliff's was notified that the Corps would perform destructive testing of the levee to see whether it contained any material larger than three inches in any direction (*id.* at 37). Knowing that it had encountered rock larger than three inches during construction, appellant alleges that Cliff's had two options: to (1) siphon through the material to determine whether the prohibited rock was present, and, if so, remove and replace the levee; or (2) save time and money by removing and replacing the levee without awaiting the results of destructive testing (*id.*). Cliff's selected the second option (*id.*). According to appellant, the Corps is responsible for Cliff's additional costs and time impacts because the situation would not have arisen if the location was as depicted in the contract and did not contain oversize materials (*id.*). Thus, appellant argues that the Corps improperly administered levee construction and that Cliff's is entitled to costs and time impacts in connection with this claim (app. br. at 36).

Conversely, the government contends that appellant failed to present evidence that the original levee as constructed by appellant complied with contract requirements or that the Corps issued improper directives to reconstruct it (gov't br. at 43; gov't reply br. at 19-20). In addition, the government argues that Cliff's must bear its costs because it voluntarily removed and replaced the levee, and it is responsible for the cost of its voluntary acts (*id.*). Finally, the government asserts that appellant has not proffered the requisite evidence to demonstrate that a constructive change took place that enlarged its performance requirements for levee construction (gov't reply at 17-20). Accordingly, the government argues that this claim is meritless (*id.* at 20). We agree.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Appellant has failed to present sufficient evidence demonstrating that the levee as originally constructed complied with contract requirements or that the Corps improperly ordered the levee's reconstruction.  The government's daily construction QARs between July 2014 and March 2015 show that the Corps repeatedly found fault with Cliff's levee construction because of the continued presence of large rocks, wood, roots, and other unsuitable material mixed in with the screened levee fill material (findings 52-62).  Therefore, Cliff's work could not have passed every inspection, as appellant erroneously claims, because the government repeatedly concluded that the work did not comply with contract specifications.  In addition, the record also reveals that Maverick freely chose to remove and replace the levee to correct these issues (findings 53, 58, 60).  Given this, we determine that appellant must bear the cost of removing the original levee and re-building the levee in compliance with contract specifications.  Accordingly, appellant's levee claim is meritless.

### 4. *Pond Riser Claim*

Appellant argues that it is entitled to additional costs and delay impacts because the contract does not contain sufficient details regarding the preferred type of vertical pipe risers to be utilized (app. br. at 39, 42).  Specifically, appellant cites §33 40 00 2.1 of the Contract Specifications, which states that pipe for culverts and storm drains shall "conform to the requirements specified" (*id.* at 39 (citing R4, tab 5 at 1736)).  Maverick counters that "there was no plan and no details [within the contract] for the risers," except for certain pond type risers requested for outfall structures 2A and 2B (app. br. at 39-40).  Given this, appellant argues that it was reasonable to assume that all risers were pond type risers until the government demanded flashboard risers in CAP submittal reviews in May 2014 (*id.* at 40).  Approximately five months later, upon delivery of the risers, appellant alleges that the government changed course and insisted that the flashboard risers should have been pond type risers and required appellant to incur additional costs and delay impacts to rectify the situation (*id.* at 44).  Appellant contends that the government's actions constitute a constructive change to the contract and that appellant is entitled to compensation under the changes clause of the contract (*id.*).

Conversely, the government argues that appellant has not proven the existence of a constructive change because (1) the record evidence does not show that the Corps directed Maverick to install flashboard risers, but rather, simply supports the allegation that the Contract Specifications could have been more detailed; (2) Transmittal No. 33 40 00-4 cannot form the basis of a constructive change because it was not an order issued by a person with the authority to make a change to the contract; and (3) Maverick simply made an unfortunate assumption that flashboard risers could be installed at outfall structures and ordered them without an approved designated

37

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

transmittal for the risers at issue (gov't reply br. at 24-25). Accordingly, the government argues that the Board should deny appellant's constructive change claim (*id.* at 25).

A constructive change "arises from the contractor's performance of work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the [g]overnment." *Tkacz Engineering, LLC*, ASBCA No. 60358, 18-1 BCA ¶ 36,940 at 179,962 (internal citations omitted) (citing *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1385 (Fed. Cir. 2017)). The constructive change doctrine arises from "Changes" clauses in government contracts authorizing the contracting officer to "unilaterally . . . alter the contractor's duties under the agreement." *Id.* (citing *Len Co. and Assocs. V. United States*, 385 F.2d 438, 441-43 (Ct. Cl. 1967)).

It is well-established that there are four elements a contractor must satisfy to prevail on a constructive change claim, i.e., (1) the contractor was compelled by the government to perform work that was not required by the terms of the contract; (2) the person directing the change had contractual authority to unilaterally alter the contractor's duties under the contract; (3) the contractor's performance requirements were enlarged; and (4) the additional work was directed by a government officer and not volunteered by the contractor. *Tkacz Engineering, LLC*, 18-1 BCA ¶ 36,940 at 179,962.

The primary evidence proffered in support of appellant's pond riser claim stems from the government's comments in response to Transmittal No. 33 40 00-4. But we agree with the government that the Corps' response to Transmittal No. 33 40 00-4 cannot form the basis of a constructive change claim because it is not an order to change any contract requirements.

In rejecting Transmittal No. 33 40 00-4, the government commented "[r]isers are intended to be flash board riser [sic] to allow for water control and of adjacent irrigation ditches. Risers shall be similar to what is being removed and the attached example from SFWMD." (Finding ¶ 106) The government similarly responded to Maverick's Transmittal No. 33 40-004.3 by commenting "CMP Pond Riser w/outlet [sic] sheets should be removed from submittal as they are not applicable to this project" (finding ¶ 108). Although slightly vague in wording, these comments were obviously written to help Maverick revise its "submittal[s]" (*id.*). The Board cannot read the comments as anything other than advice about which materials constituted satisfactory materials as detailed in the specifications, thereby actually reinforcing the contract requirements rather than superseding them (*see* findings 13-14). In addition, the record evidence shows that appellant did not ask the government whether the

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

comments were intended as a direction to immediately purchase pond risers. Instead, appellant took matters into its own hands and chose to spend money and time purchasing and installing pond risers under what the government correctly calls "an unfortunate assumption" (gov't reply br. at 25). Given this, appellant has not met its burden of proof to show that the Corps changed the contract through its responses to Maverick's transmittal, a critical element of the constructive claim doctrine. Thus, appellant has not met the first element of the constructive change doctrine. As such, appellant cannot establish that a constructive change took place, and the analysis ends here.

Even assuming, *arguendo*, that ACO Miller had authority to alter the duties under the contract, appellant has not met the third or fourth elements of the constructive change doctrine. As an initial matter, appellant has not shown that its performance requirements were enlarged by ACO Miller's comments on its transmittal because, as previously discussed, such comments cannot be construed as an order to change any contract requirements. As such, these comments can hardly be considered "additional work" for appellant to complete as part of its responsibilities under the contract. Given this, appellant has failed to meet the third and fourth elements of the constructive change doctrine. Accordingly, appellant's constructive change claim must fail.

### 5. *Sheet Pile Wall Claim*

The parties agree that the government disseminated defective specifications and plans for the construction of Pump Stations 14 and 15, but appellant alleges that the government only partially compensated it for the additional costs that Close incurred to correct the design defect in the sheet pile wall anchoring system at Pump Station 15 (app. br. at 45-56). Specifically, appellant alleges that the contract directed Close to construct multiple pump stations with laterally supportive tie rod anchors (*id.* at 47). Although the designer of record intended for such anchors to pass through certain In-Pans, the diagrams provided to Close defectively lined up the anchors with Out-Pans and Close relied upon such diagrams when it began pouring concrete to construct Pump Station 15 (*id.* at 49). Appellant alleges that Close had no way of knowing that the designer of record had a different intent than what was reflected in the plans and specifications (*id.* at 53). Ultimately, the government issued 2 unilateral modifications for the corrective work on Pump Station 15 totaling $44,524.04 for 26 calendar days of work (*id.*). However, appellant alleges that Close actually spent 192 calendar days and $220,181.54 to correct the design defect (app. br. at 45). Appellant argues that the contract carried an implied warranty that the specifications were free from design defects and that Close was bound to build according to the specifications actually

39

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

provided (*id.* at 56). As a result, appellant believes that Close is entitled to recuperate its actual costs for the time it spent correcting such design defects (*id.*).

Conversely, the government contends that it is not liable for Close's actual costs because appellant was visibly "confronted with obvious and recognized errors" as well as repeatedly informed of such errors by the government but chose to proceed with work that ultimately had to be re-done (gov't br. at 45-47). Specifically, the government argues that Close was told not to pour concrete in Pump Station 15 and that it chose to do so anyway (gov't reply br. at 21). To support this assertion, the government cites tabs **373 and 374 of the record, which contain a memorandum for record that summarizes numerous conversations Corps personnel had with appellant's staff during which Corps personnel allegedly directed Close not to pour the concrete (R4, tabs 373-74). Although tabs 373 and 374 are dated four and a half months after the conversations which they allegedly summarized, the government argues that contemporaneous QA reports and the sworn testimony of Mr. Tony Jettinghoff, the Corps' area engineer on the project, demonstrate that these conversations did in fact take place before Close poured the concrete (R4, tab 151 at 5675, 5669; tr. 3/126, 135-36, 167-68, findings 76-81). In addition, the government argues that the record evidence shows that Maverick indicated to the government that it had taken corrective actions prior to pouring the concrete (gov't reply at 23 (citing R4, tab [151] at 5681) (Jeff Zimmerman wrote: "On the way in to [sic] the office I called the Alternate QC Manager and discussed PS15 Sheet Pile Cap. He told me 'the guys' were finishing corrective actions and all would be ready before concrete arrived") (*see* Finding ¶ 79)). Ultimately, the government adopted the position that a design deficiency existed on May 29, 2015, and it issued Modification Nos. P00007 and P00008 (gov't reply br. at 23). According to the government, all costs and time delays appellant seeks above those which were provided through these modifications stem from removal of concrete that Close erroneously poured in Pump Station 15 against the government's direction (*id.* at 21). Further, the government argues that the floating tie rods constituted an error that Close should have found obvious, even without government notification (*id.* at 23). As such, the government argues that the Board should deny appellant's claim for additional costs and time extensions in connection with the design defects for Pump Station 15 (*id.* at 24).

In order to shift the burden of its actual costs to the government, appellant must establish that (1) the government-furnished design specifications were defective, and (2) a causative link between the alleged design defect and the additional costs and time that Close spent to correct the defect. *KiewitPhelps*, ASBCA No. 61184, 23-1 BCA ¶ 38,254 at 185,765

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The issue of defective specifications is governed by the *Spearin* doctrine. The *Spearin* doctrine states that "[w]hen the [g]overnment provides specifications directing how a contract is to be performed, the [g]overnment warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications." *Hercules Inc. v. United States*, 516 U.S. 417, 425 (1996); *see, e.g., United States v. Spearin*, 248 U.S. 132, 136 (1918); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000) ("When the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications and the contractor is entitled to recover all of the costs proximately flowing from the breach"). It is well-established that the *Spearin* doctrine's implicit warranty applies to design specifications that permit no deviations in contract performance, and that the doctrine does not apply to performance specifications that "merely set forth an objective without specifying the method of obtaining the objective." *White v. Edsall Constr. Co.,* 296 F.3d 1081, 1084 (Fed. Cir. 2002).

In addition, the *Spearin* doctrine does not negate the contractor's duty to investigate or inquire about a patent ambiguity, inconsistency, mistake, or obvious error that the contractor recognized or should have recognized within the specifications. *Id.* at 1085. "A design defect is not sufficiently patent so as to trigger a duty to inquire unless the defect constitutes a 'major patent discrepancy, or obvious omission, or a drastic conflict in provisions'" that would be clearly evident to a reasonable contractor. *KiewitPhelps*, 23-1 BCA ¶ 38,254 at 185,766. As such, contractors are not expected to "ferret out hidden or subtle errors in the specifications" to meet their duty to inquire. *Id.* (citing *Edsall*, 296 F.3d at 1085).

It is undisputed that: (1) USACE provided the design for the Project; (2) Maverick and its subcontractors had no input in the drafting of any of the contract's specifications and were not permitted to deviate from the contract's requirements; and (3) on May 29, 2015, the government conceded that it disseminated defective specifications and plans for the construction of Pump Stations 14 and 15 (findings 4, 89). However, the record reveals that Mr. Zimmerman repeatedly informed Maverick's alternate QC manager that there was something wrong with the sheet pile cap (finding 76). In QAR No. 474, dated March 25, 2015, Mr. Zimmerman noted that "Anchor Rods are not in contact with the Sheet Pile Wall and are floating in the middle of the sheet pile cap" (finding 77). Thereafter in QAR No. 476, dated March 27, 2015, Mr. Zimmerman wrote:

> Tie Back Anchor Rods are not all in contact with Sheet Pile Wall. Alt QC Manager told me they would "extend the rods or cut holes or do whatever we have to do to make

41

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

it work. No Problem." I was then told that "if it isn't
ready Monday, I won't let the [sic] guys pour.

(Finding 78) In QAR No. 479, dated March 30, 2015, Mr. Zimmerman wrote "On the way in to [sic] the office I called the Alternate QC Manager and discussed PS15 Sheet Pile Cap. He told me 'the guys' were finishing the corrective actions and all would be ready before concrete arrived." (Finding 79) Given the plethora of evidence demonstrating that Maverick's alternate QC manager was informed of these issues, appellant's argument that Close had no way of knowing that the sheet pile cap design for Pump Station 15 was faulty is unpersuasive.

The identity of appellant's alternate QC manager, however, is unclear from the evidence currently before the Board. The record reveals that someone named "Carlos Rodriguez" served as Maverick's alternate QC manager, but this name is shared by two of Maverick's employees: its president, Carlos Rodriguez Sr., and his son, Carlos A. Rodriguez. The record is unclear as to which man served as the alternate QC manager that was in contact with Mr. Zimmerman on the days in question (finding 76 n.7). But, the record demonstrates that Mr. Zimmerman was assured by at least one of these men that (1) "if [the tie back anchor rods were not in contact with the sheet pile wall], I won't let the [sic] guys pour," and (2) "'the guys' were finishing the corrective actions and all would be ready before concrete arrived" (findings 78-79). As either Maverick's president or his son, "Carlos Rodriguez" was responsible for keeping Maverick's subcontractors informed of new information that would significantly change the trajectory of contract performance from what was detailed within the original design drawings. The record evidence shows that at least one man named Carlos Rodriguez was armed with information that should have prevented him from allowing Close to pour concrete on the sheet pile cap at Pump Station 15. Because he did not, we must deny appellant's claim for actual costs in connection with the re-work it performed at Pump Station 15.[13]

---

[13] The parties also debate the admissibility of certain record evidence dated several months after the conversations that they document, namely: (1) a Memorandum for Record compiled by the government, dated August 27, 2015, asserting that there were verbal discussions between the parties regarding possible issues with the design of Pump Station 15 before the concrete cap was poured, and (2) a Letter #H-0032 signed by Maverick's president, Carlos Rodriguez, dated September 11, 2015, stating that the Corps only identified the design errors after concrete was poured (app. supp. R4, tab 71; R4, tabs 373, 374). Because the record contains contemporaneous evidence in the form of QC control reports compiled by the government, we rely solely on the

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

### 6. *Seed Establishment and Vegetative Free-Zone Claim*

Appellant alleges that it is entitled to costs and a time extension from February 19, 2016, until project closeout because the government improperly changed the contract by requiring Close to continue working for 17 months after the contract completion date to create a 5-foot vegetation-free zone and establish grass seed (app. br. at 57-60). Specifically, appellant argues that the contract explicitly stated that (1) the time for contract completion did not include the establishment of grass and (2) the seed establishment period would end 3 months after the last day of the seeding operation (*id.* at 59). Instead of abiding by the contract specifications, appellant alleges that the Corps required Close to perform these tasks after the contract completion date, despite the fact that the sandy soil material surrounding the levee was not conducive to establishing grass and any grass that did grow would be difficult to mow and maintain (*id.* at 57). In addition, appellant contends that Close was required to clear and mow outside of the limits of the seed establishment when the Seminole Tribe expressed a desire to have a 5-foot-wide strip at the toe of each levee free of hardwood vegetation (*id.* at 59). According to appellant, there was no contractual basis to require Close to continue performing as long as it did (*id.* at 60). As such, appellant requests that the Board grant Close's claim for costs and a time extension.

The government counters that Maverick can recover neither costs nor time extensions because the work Close performed was part of the contract requirements (gov't br. at 55). Specifically, the government argues that Maverick has not cited any affirmative representations within the contract regarding the conditions of the levee embankment where the seeding was to occur (*id.* at 56). According to the government, "[t]he absence of any positive affirmative representations should be of no surprise because the levee embankments did not exist when the Contract [was] awarded because Maverick had not built them yet" (*id.*). Therefore, the government alleges that it cannot be held liable for man-made conditions created by the contractor or its subcontractors (*id.* at 56-57). In addition, the government argues that the contract required appellant to establish a 5-foot vegetation free zone and that any clearing and grubbing performed to create such a zone is within the scope of the contract and covered by line-item pricing (*id.* at 57-58). Given this, the government contends that appellant cannot carry its burden to prove all factors necessary to establish either a Type I or a Type II differing site condition claim (*id.* at 56-57). Accordingly, the government argues that the Board should deny appellant's claim for costs and requested time extensions associated with seed establishment and the five-foot vegetative-free zone (*id.* at 58).

---

contemporaneous evidence and do not consider the contents of any evidence dated long after March 2015.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

As previously discussed, a constructive change "arises from the contractor's performance of work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the [g]overnment." *Tkacz Engineering, LLC*, 18-1 BCA ¶ 36,940 at 179,962 (internal citations omitted) (citing *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1385 (Fed. Cir. 2017)). As listed *supra*, there are four elements that must be satisfied to prevail on a constructive change claim. *Tkacz Engineering, LLC*, 18-1 BCA ¶ 36,940 at 179,962.

Regarding the first element, whether the contractor was compelled to perform work not required by the contract, the contract requires appellant to perform clearing, grubbing, seeding and mulching tasks that were payable on a per-unit basis (findings 3, 129-30). Appellant alleges that it was required to perform these tasks multiple times and adhere to "additional criteria for [the Corps'] acceptance" of its work, but the record contains very little documentation regarding the work that appellant actually completed and even less regarding the "additional criteria" allegedly imposed by the Corps (tr. 6/80). The government correctly notes that appellant was required to keep maintenance logs of the work that it performed to comply with the contract, but surprisingly, appellant failed to include any such logs in the evidence that is presently before the Board. The best argument proffered by appellant is one of timing, namely, that the contract completion date does not include the establishment of grass and that the seeding establishment period ended 3 months after the last day of the seeding operation (findings125-26). However, the contract explicitly states that the contractor shall be responsible for all work performed until completion and acceptance of the *entire* work, except for any completed unit of work which may have already been accepted under the contract (finding 133) (emphasis added). In addition, the contract also requires appellant to repair or reinstall grass that does not satisfy the government's requirements (finding 126). Upon reviewing the little evidence that is currently before the Board, and considering these contract provisions, the Board can only conclude that Close had a difficult time complying with the subject specifications. Close may have incurred additional costs to do so, but the record evidence currently before the Board does not support a shift of these costs to the government. If Close experienced difficulties in complying with contract requirements, it is responsible for the time and expense it incurred to comply with explicit contract requirements to plant seed, grow satisfactory grass, and produce a five-foot vegetative-free zone so that the government could accept the entirety of its work. Given this, appellant fails to satisfy the first element of its constructive change claim and, accordingly, appellant cannot establish that the government constructively changed the contract. Appellant's seed and vegetation-free zone claim must be denied.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

7. *Cumulative Delays and Liquidated Damages – The Experts*

Lastly, appellant alleges that it is entitled to a 695-day time extension through March 15, 2017, the final performance acceptance date (app. br. at 61-67).  To support this argument, appellant relies on the testimony and report of its scheduling expert, Mr. Brannon, who attributed the alleged days of delay to three general sources:  the alleged differing site condition, work associated with Pump Station 15, and delays in project acceptance (*id.* at 61-63; *see also* app. ex. A at 7).  These sources are laid out in five periods of delay in his expert report:  (1) a 219-day delay for the alleged differing site conditions (April 24, 2015 to August 1, 2015); (2) a 76-day delay for the redesign of the retaining wall anchors at Pump Station 15 (August 1, 2015 to November 20, 2015); (3) a 35-day delay for the completion of the redesign and rework of Pump Station 15 (November 20, 2015 to February 5, 2016); (4) an 81-day delay for the completion of the Phase II redesign of the anchoring system at Pump Station 15 (February 5, 2016 to April 26, 2016); and (5) a 284-day delay for the establishment of ground cover and additional earthworks maintenance during grass seeding (April 26, 2016 to March 15, 2017) (*id.*).  Appellant argues that it presented sufficient evidence to demonstrate that it and its subcontractors were required to perform work which was not included in the original baseline schedule, and that the additional work impacted the construction schedule and appellant's ability to finish the work in accordance with the original timeline contemplated in the contract (app. br. at 64; app. reply br. at 54).

Appellant also asserts that the government must release liquidated damages that it has withheld in connection with the late completion of contract performance.  Specifically, appellant alleges that the government waived any entitlement to liquidated damages by unilaterally changing the anchor rod connection design of Pump Station 15 after the contract completion date (app. br. at 65-67; app. reply br. at 55).  In addition, appellant argues that Florida law prohibits the government's withholding of liquidated damages for the establishment of seeding and vegetation because the sum of such damages is grossly disproportionate to the damages suffered here, where the government has beneficial use of the improvement, and no substantial damages were suffered (app. reply br. at 56).  Thus, appellant believes that it is entitled to a 695-day time extension and that the government must release any liquidated damages in its possession (*id.*; app. br. at 67).

Conversely, the government argues that Maverick is not entitled to any days of delay because it has not met its burden of proving all of the elements of its claims (gov't reply br. at 29; gov't br. at 62).  In addition, the government argues that Mr. Brannon's testimony and report are not reliable for several reasons (gov't reply br. at 29).  First, the government argues that Mr. Brannon's direct testimony should not be given much weight because he had a document open on his computer during direct

45

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

examination that contained answers to each of the questions he was asked (gov't br. at 59-60). Second, the government argues that Mr. Brannon's expert report contains numerous deficiencies, including an insufficient number of time periods in its windows analysis, no mention of concurrent delays, and the identification of only four documents to support his conclusion that grass seed establishment controlled the critical path between April 26, 2016, and March 15, 2017, all of which were dated long before such work was performed (*id.* at 59-61; gov't reply br. at 29-32). Given the issues with Mr. Brannon's testimony and expert report, the government requests that the Board rely upon the report proffered by its scheduling expert, Ms. Chen, should the Board find entitlement on any of appellant's claims (gov't br. at 59, 61-62). Finally, the government asserts that it properly assessed liquidated damages in connection with the subject contract and that Maverick failed to establish its alleged delays were excusable by a preponderance of evidence (gov't reply br. at 32-33; *see also* gov't br. at 63). Accordingly, the government requests that the Board deny appellant's delay and liquidated damages claims.

To prevail on a claim for compensable delay, Maverick must "establish the extent of the delay, [its] harm resulting from the delay, and the causal link between the government's wrongful acts and the delay." *Essex Electro*, 224 F.3d at 1295; *see, e.g., Derian, Inc.*, ASBCA No. 62957, 23-1 BCA ¶ 38,425 at 186,756; *States Roofing Corp.*, ASBCA No. 54860, 10-1 BCA ¶ 34,356 at 169,661. Such a "causal link" exists if appellant can demonstrate "that the government's actions affected activities on the critical path of the contractor's performance of the contract." *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1317 (Fed. Cir. 2000); *see also Essex Electro*, 224 F.3d at 1295. The term "critical path" is defined as "the longest path in the schedule on which any delay or disruption would cause a day-for-day delay to the project itself; those activities must be performed as they are scheduled and timely in order for the project to finish on time." *GSC Constr., Inc.*, ASBCA Nos. 59402, 59601, 21-1 BCA ¶ 37,751 at 183,241 (internal citations omitted). Finally, Maverick must also account for any concurrent delay by showing that such delays were not within its control. *Essex Electro*, 224 F.3d at 1295; *States Roofing Corp.*, 10-1 BCA ¶ 34,356 at 169,661.

In addition, it is well established that the government "bears the initial burden of proving that the contractor failed to meet the contract completion date and that the period of time for which it assessed liquidated damages is correct." *Sauer, Inc.*, ASBCA No. 62395, 21-1 BCA ¶ 37,845 at 183,753 (citing *KEMRON Envtl. Servs. Corp.*, ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399). If the government can overcome this initial burden, appellant must show "either that the government incorrectly assessed the damages under the contract, or that appellant's failure to comply with the terms of the contract was excusable." *Chem-Care Co.*, ASBCA No. 53614, 06-2 BCA ¶ 33,427 at 165,726.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Maverick has failed to establish the extent of any delay, the harm sustained by any delay and, most importantly, that any delay days were solely attributable to government actions.

Each of the parties presented the testimony of a scheduling and delay expert – Mr. Brannon for Maverick, and Ms. Chen for the Corps – who developed, through significant time and effort, schedule and delay analysis of the project. The reports and analysis of each expert were extensive, and the Board found the work that each expert performed helpful in organizing and categorizing the delays that occurred during performance.

Mr. Brannon quantified that the project incurred 695-days of delay stemming from three general sources: the alleged differing site condition, work associated with Pump Station 15, and delays in project acceptance (finding ¶ 147). As an initial matter, appellant has not satisfied any of the elements of a Type I differing site condition, and nothing in Mr. Brannon's report causes us to change our opinion on the question of whether appellant is entitled to any days of delay for this claim (*see generally* app. ex. A). Given this, we determine that any earthwork impact delays that appellant and its subcontractors experienced are not compensable. Similarly, we hold that appellant is not entitled to any compensation for alleged delays associated with Pump Station 15. The parties agree that the government issued Modification Nos. P00007 and P00008 to address a design deficiency that existed in connection with the pump station. We agree with the government's expert, Ms. Chen, that these modifications fairly compensated Maverick and its subcontractors for a total of 28 days of delay (finding 148, R4, tab 380 at 25109, 25112). In addition, Ms. Chen persuasively opined that 15 more days of excusable but non-compensable weather delay occurred due to flooding in multiple neighboring canals (*id.* at 25112-13). Because the government has already remunerated appellant and its subcontractors for the compensable days of delay that it experienced, we conclude that appellant is not entitled to any additional compensation for delays it may have experienced in connection with Pump Station 15. Lastly, we hold that appellant is likewise not entitled to any compensation for delays it experienced in connection with Close's efforts to plant seed, grow satisfactory grass, and produce a five-foot vegetative-free zone. Appellant failed to identify any work that Close performed above and beyond explicit contract requirements and nothing in Mr. Brannon's report causes us to reinterpret the record evidence on the subject. While Close likely spent additional time and money to complete these tasks, any delays caused by Close's struggles are not compensable. Maverick's claims for its alleged increased costs, as well as those costs allegedly incurred by its subcontractors Cliff's and Close, are denied.

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

8. *Liquidated Damages*

Finally, appellant has not established that the government incorrectly assessed liquidated damages under the contract. The record evidence reveals that appellant did not substantially complete its work on the Project until March 14, 2017, long after the original contract completion date of April 20, 2015 (finding 9). The contract contained a liquidated damages clause, which stated, "[i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of [$]1,718 for each calendar day of delay until work is completed or accepted" (finding 134). In accordance with the contract's liquidated damages clause, the government withheld $1,718 per day for 241 days between June 14, 2015, and March 6, 2016 for a total of $242,507.52 (findings 135-40). The government could have collected even more liquidated damages than it did to cover the entirety of the period between April 20, 2015, and March 14, 2017, but the contracting officer chose to stop withholding retainage in pay estimate no. 21 (finding 140) ("Maverick Constructors, LLC is behind schedule . . . No retainage will be withheld on pay request number 21 per the guidance of the Contracting Officer."). Appellant has not demonstrated that the government contributed in any substantial way to the delays at issue in this appeal. Given this, the government correctly assessed liquidated damages between the contract completion date and the date of substantial completion of work. Accordingly, we must deny appellant's request for the release of liquidated damages.

CONCLUSION

The appeal is denied.

Dated: February 19, 2025

OWEN WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

DOCUMENT FOR PUBLIC RELEASE.
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I concur

I concur

_____
MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

_____
DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 61989, Appeal of Maverick
Constructors, LLC, rendered in conformance with the Board's Charter.

Dated:

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals